This suit is to set aside certain contracts of sale of real estate claimed to have been made by complainant, through defendant William Kennelly, Incorporated, as auctioneer, to defendant Mahoney, and assigned by Mahoney to defendant Ross. Defendant Ross seeks specific performance of the contracts. *Page 338 
Complainant contracted with the Kennelly corporation to auction seventy-four lots in Englewood. The contract between them provided that the auctioneer's compensation should be considerably less if the sale should not bring at least $50,000. The sale was advertised for the 19th day of May, 1928, but because of weather conditions was adjourned to the 9th day of June following, at which time it was held. The question now before this court is as to whether there was a valid and binding sale to defendant Mahoney of a certain forty-two of the lots. Of the total seventy-four lots it is conceded that valid sales were made by the auctioneer of thirty-two, of which defendant Mahoney made a purchase of ten.
There is a conflict in the testimony as to what took place at the auction respecting the forty-two lots in question. The defendants claim that one Sann, an officer of complainant, bid in these forty-two lots from time to time during the course of the sale. They assert that at the conclusion of the sale, when it was made known to the auctioneer that Sann did not intend to actually take the lots, the auctioneer again put up the forty-two lots in one block, that Mahoney first bid $900 for each of them, that some undisclosed person bid $950 and that Mahoney then bid $1,000 each, whereupon the forty-two lots were knocked down to him and he executed contracts of sale with the auctioneer. Complainant contends that no such transaction took place, but that the alleged sale to Mahoney was made some time after the conclusion of the sale, was made without the knowledge or consent of complainant and was in nowise binding upon it.
I find that the contentions of the complainant have been sustained by the evidence. Under the contract with the auctioneer, complainant had the right at its option to direct a resale. It was not satisfactorily shown that complainant directed a resale such as the alleged transaction with Mahoney would have been. Printed forms of contracts of sale with terms attached were prepared in advance with dates fixed by the original date set for the auction, which *Page 339 
provided for a payment of ten per cent. of the purchase price together with the auctioneer's fee at the time of the sale, and twenty per cent. on the 19th day of June which would be thirty days later. On the contracts admittedly valid for the thirty-two lots, the date of June 19th for the second payment was altered in pen and ink on the printed forms to July 9th. With one exception, in the twelve contracts for the forty-two lots in dispute, the date for the payment of twenty per cent. was not altered and accordingly the payment of twenty per cent. on all except the three lots was left as due on June 19th. This seems significant of irregularity in the transaction. No payment was made of the twenty per cent. on June 19th.
If Mahoney bought fifty-two lots, as defendants claim, he was required by the terms of sale to make a deposit of ten per cent. plus auctioneer's fee of $25 a lot. This would amount to $7,410. All the Mahoney contracts, including those for the disputed lots, show receipts signed on behalf of the auctioneer for the full payment of the ten per cent. and the auctioneer's fee, but these payments were not made then. Mahoney's checks were produced on the trial. There are three of these, one dated June 9th for $765, one dated June 13th for $4,095 and one dated June 18th for $1,050. On the date of the sale Mahoney had only a nominal balance in the bank. Deposits were made by him to make good the first two of these checks, two days after their respective dates. The check dated the day of the sale did not cover the requirements of the ten lots admittedly purchased by him, since the requirment of the ten per cent. deposit on these lots was $1,015 and auctioneer's fees $250, but it is a substantial proportion. It is significant that the second check for $4,095, exactly ten per cent. of the purchase price of the forty-two lots, was not given until four days after the sale. There seems to have been no compliance with the terms of sale so far as the forty-two lots were concerned.
Testimony of the auctioneer as to the transactions relating to the forty-two lots is by no means clear or convincing. *Page 340 
His testimony was confused and was contradicted not only by complainant's witnesses but to a certain extent by that of Mahoney himself. Mr. Kennelly testified that when he was about to close the sale Mr. Sann came up to him and said that he wished the auctioneer to get him out of the lots he had bid in. That there was an argument and then Mahoney came up to where they were standing and said he would give $900 a lot for anything there was left. That someone else said $950, Mahoney said $1,000, and thereupon the two lots were knocked down to Mahoney. Mahoney testified that he was sitting in the rear of the tent when he made his bid. The auctioneer is directly interested, for on the upholding of the disputed contracts depends not only commissions thereon, but his bonus for aggregate sales exceeding $50,000.
Mr. Harry Cooper, attorney for the complainant, was present at the sale. He testified that he sat alongside of the auctioneer during the entire sale and when the bidding was over on each particular group of lots, he indicated to the auctioneer whether the sale was a bona fide one or whether the high bidder was a representative of the owner merely bidding to keep the prices up. This the complainant had a right to do under their contract with the auctioneer, although the complainant as well as the auctioneer advertised the sale as a liquidation sale, and apparently allowed the public to believe that it was being held without reservation. Mr. Cooper testified that he was present from the beginning of the sale until the auctioneer left the stand. He says that at the time he made a record, produced at the trial, of all sales, indicating thereon whether they were bonafide or fictitious, and that there was no sale of forty-two lots made to Mahoney up to the time the auctioneer left the block. If this testimony be accepted as true, the sale to Mahoney was not a valid one. Mr. Stuhr, also a member of the bar of this state, testifies that he was present at the end of the sale. That he talked to Mahoney; that Mahoney told him he had bought ten lots and that the witness thereupon arranged to buy Mahoney's contract for the ten lots. This direct testimony *Page 341 
is convincing as against the hazy inconsistent testimony of the defendants, particularly in the absence of the auctioneer's assistants who signed in his behalf the contracts for the disputed lots.
I therefore find that there was no valid sale of the forty-two lots in question and that the documents purporting to be the contracts therefore are void. Submit a decree accordingly.